**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DIANA FREDIANI,                                        No. C 05-4152 CW

      Plaintiff,                                 ORDER DENYING
                                                       PLAINTIFF'S
  v.                                                   MOTION FOR
                                                       SUMMARY JUDGMENT
JO ANNE B. BARNHART,                                   OR REMAND AND
Commissioner of                                        GRANTING
Social Security,                                       DEFENDANT'S
                                                       CROSS-MOTION FOR
      Defendant.                                 SUMMARY JUDGMENT

_____/

    Plaintiff Diana Frediani moves for summary judgment or, in the
alternative, for remand.  (Docket No. 6.)  Defendant Jo Anne
Barnhart, in her capacity as Commissioner of the Social Security
Administration (Commissioner), opposes the motion and cross-moves
for summary judgment.  (Docket No. 8.)  Having considered all of
the papers filed by the parties, the Court denies Plaintiff's
motion for summary judgment or remand and grants Defendant's cross-
motion.

BACKGROUND

I.   Procedural History

    On April 1, 2003, Plaintiff filed an application for
disability insurance benefits under Title II and for supplemental
security income benefits under Title XVI of the Social Security
Act, claiming a disability onset date of September 1, 2001.

United States District Court
For the Northern District of California

(Administrative Record (AR) at 57-59, 303.)[1]  She claimed an
inability to work because of severe pain in her left knee.  (AR
64.)  On August 27, 2003, Plaintiff's claim was denied and she
moved for reconsideration.  (AR 29, 32.)  On October 8, 2003, the
motion for reconsideration was denied.  (AR 34-38.)  On November 4,
2003, Plaintiff filed a request for a hearing before an
administrative law judge (ALJ).  (AR 39.)

On June 3, 2004, a hearing was held before an ALJ.  (AR 294.)
Plaintiff, who was not represented by counsel, testified at the
hearing.  (AR 296-297.)

On November 26, 2004, the ALJ issued an opinion finding that
Plaintiff was not disabled within the meaning of the Social
Security Act.  (AR 17.)  Plaintiff's request for administrative
review by the Appeals Council was denied.  (AR 6.)  Plaintiff then
initiated the instant action for judicial review under 42 U.S.C.
§§ 405(g), seeking an award of benefits, or in the alternative,
remand to the Commissioner for further proceedings.

II.  Factual History

A.  Work Experience

Plaintiff was born on June 8, 1938, in San Francisco,
California.  (AR 300.)  She received an Associate of Arts Degree in
1959 and later received training in computers, note taking, and
other skills required for the performance of clerical work.  (AR
301.)  Plaintiff worked as an office assistant or technician from

---

[1]Although Plaintiff applied for benefits under Title II and
XVI, apparently she is already receiving benefits under Title XVI.
See AR 306.  Therefore, only disability benefits under Title II are
at issue here.

2

United States District Court
For the Northern District of California

1981 to 2001, when she retired.[2]  As an office assistant and technician, Plaintiff operated a computer, worked in customer service, performed radio dispatch, wrote reports, filled out forms, filed, and worked in a stockroom and a mailroom.  (AR 76-78.) Plaintiff subsequently worked five hours a week for about two weeks as an accounts receivable clerk from September to October, 2002, before being laid off.  (AR 79; 302.)

B.   Medical History

Plaintiff claims disability based on an injury sustained while at work in June, 1992 when she tripped over a cord at her desk and twisted her knee.  (AR 103.)  In June, 1992, she was referred to physical therapy by Dr. Aldis Baltins, M.D., an orthopedist.  (AR 102.)  In July, 1992, Plaintiff was examined by Dr. Gerald King, M.D., an orthopedist, who diagnosed a left knee injury, probably related to a medial meniscal tear.  (AR 103.)  In July, 1992, Plaintiff underwent arthroscopic surgery of the left knee where abrasion osteoplasty was performed.  (AR 111.)  In November, 1992, Dr. Baltins observed that Plaintiff was making slow progress with her left knee after the surgery.  (AR 105.)

In December, 1992, Dr. Gilbert J. Kucera, M.D., an orthopedist, examined Plaintiff in the capacity of an Agreed Medical Examiner for the State Compensation Insurance Fund.  (AR 143.)  Dr. Kucera reported that Plaintiff's left knee injury precluded her from prolonged standing and very heavy lifting.  (AR

---

[2]Plaintiff stated that the office assistant and office technician jobs involved identical job duties.  Her job title changed in 1994, but her duties remained the same.

**United States District Court**
For the Northern District of California

141.)

On October 19, 1993, Plaintiff underwent a second arthroscopic surgery on the left knee for internal derangement.[3] (AR 152.)

In May, 1994, Dr. James Damon, M.D., an orthopedist, concluded, in a Qualified Medical Examination for the State Compensation Insurance Fund, that Plaintiff should be precluded from repetitive kneeling or squatting and prolonged standing or walking. (AR 125.) He also advised that Plaintiff could not work in a position that required her to perform any heavy lifting. (Id.)

In July, 1994, Plaintiff was examined by Dr. Steven Smith, M.D., an orthopedist. (AR 146.) Plaintiff reported increased swelling and pain in her left knee. (Id.) Two weeks later, Plaintiff reported improvement after starting on a non-steroidal anti-inflammatory treatment. (AR 147.)

In July, 1994, Dr. Kucera performed an Agreed Medical Legal Evaluation Reexamination for the State Compensation Insurance Fund and found that Plaintiff had crepitus[4] and chronic degenerative changes in her left knee. (AR 129; 132.) Dr. Kucera reported that Plaintiff's disability precluded her from prolonged standing and very heavy lifting and that Plaintiff will "eventually require a total knee replacement within a few years." (AR 133.)

---

[3]Derangement means "a disturbance of the regular order or arrangement." Stedman's Medical Dictionary (478) (27th Ed. 2000).

[4]Crepitus is a condition of "noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." Stedman's Medical Dictionary 424 (27th ed. 2000).

In June, 1997, Plaintiff reported to Dr. Smith that she had left knee pain but no swelling, locking, or giving way.  (AR 144.) X-rays were unchanged from 1994 and Dr. Smith advised continuation of anti-inflammatory medication, as needed, conservative management and home exercise treatment.  (Id.)

In December, 1998, Plaintiff received authorization for a knee brace and a disabled placard from her family physician.  (AR 198.)

In March, 1999, Humboldt Orthopedic Associates reviewed x-rays taken over the previous six years and noted progressive narrowing and enlargement of a spur at the medial joint margin of the left knee.  (AR 166.)  Plaintiff was advised to use a cane for long walks.  (AR 167.)

In March, 2000, Humboldt Orthopedic Associates reported that Plaintiff had moderate left knee medial compartment arthritis but was able to do office work activities.  (AR 164.)

In December, 2001, an x-ray showed degenerative changes in Plaintiff's left knee.  (AR 225.)

In 2001 and 2002, Plaintiff visited Dr. Laurence Alavezos, M.D., for her knee arthritis and pain.  In September, 2001, Dr. Alavezos gave Plaintiff Celebrex[5] for her arthritis.  (AR 197.)  In July, 2002, Dr. Alavezos observed continued crepitus in Plaintiff's left knee.  (AR 185.)  Dr. Alavesos advised Plaintiff that she might need a prosthesis and suggested she would benefit from a cortisone shot.  (Id.)  Plaintiff informed Dr. Alavesos that she

_____

[5]Celebrex is indicated for "relief of the signs and symptoms of osteoarthritis."  Physicians' Desk Reference (PDR), 60th ed., 3131 (2006).

United States District Court
For the Northern District of California

did not want a cortisone shot or a prosthesis at that time.  (Id.)
In August, 2002, Dr. Alavezos noted that Plaintiff walked with a
limp, had pain with manipulation of the knee, and confirmed the
diagnosis of degenerative joint disease.  (AR. 184.)

In December, 2002, Dr. Eric Schmidt, M.D., reported that x-
rays showed Plaintiff's right knee spurring with severe joint space
narrowing in her left knee.  (AR 264.)  In April, 2003, Dr. Schmidt
reported that Plaintiff's knee condition appeared to have worsened
because she was using a treadmill and he advised her to use a
stationary bicycle or Nordic Track.  (AR 260.)

In May, 2003, Plaintiff underwent a third arthroscopic surgery
with debridement[6] and meniscus[7] excision.  (AR 255.)  On May 21,
2003, after Plaintiff's left knee surgery, Dr. Schmidt reported
that Plaintiff was ambulating without a cane and had full range of
motion.  (AR 292.)  In January, 2004, Dr. Schmidt reported that
Plaintiff was progressing well but had good days and bad days, was
using a cane for balance, and had continued knee pain.  (AR 287.)

Plaintiff received physical therapy from Bob Hassett, M.S.,
P.T., from November, 2001, through May, 2003.  In November, 2001,
Hassett reported that Plaintiff was able to walk without a

---

[6]Debridement is an "excision of devitalized tissue and foreign matter from a wound."  Stedman's Medical Dictionary 460 (27th ed. 2000).

[7]Meniscus is "a crescent-shaped fibrocartilaginous structure of the knee, the acromio- and sternoclavicular and the temporomandibular joints."  Stedman's Medical Dictionary 1091 (27th ed. 2000).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

supportive device but had an antalgic gait[8]. (AR 251.) In December, 2001, Hassett reported that Plaintiff began walking on a treadmill and doing kinetic exercises which decreased her pain from a scale of seven out of ten, ten being the highest level of pain, to four out of ten. (AR 249.)

In January, 2002, Hassett reported that Plaintiff was doing "extremely well on her recovery program." (AR 248.) In March, 2002, Plaintiff told Hassett that the pain still bothered her but she "just lives with it." (AR 245.) Plaintiff also said that she was contemplating skiing. (Id.) Hassett advised her to ski cautiously and carefully and reported that he thought "this would be a good test to find out her stability." (Id.)

On May 16, 2002, Hassett reported that Plaintiff's symptoms appeared to be vacillating, which is common with osteoarthritic medial knee pain. (AR 243.) Hassett also reported that Plaintiff said she felt better when she cut back on her exercise program. (Id.) On May 29, 2002, Hassett reported that Plaintiff had not attended seven out of her last ten authorized visits, and he encouraged Plaintiff to resume her attendance at the health club located at the physical therapy office. (AR 242.) Plaintiff resumed her exercise program in June, 2002 and reported a decrease in knee pain from seven to eight out of ten to three out of ten. (AR 241.)

---

[8]An antalgic gait is "a characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side." Stedman's Medical Dictionary 722 (27th Ed. 2000).

**United States District Court**
For the Northern District of California

In August, 2002, Hassett observed that Plaintiff was able to "walk in and out of the office, sit and stand, and move fairly comfortably," but he noted that five years ago Plaintiff's orthopedist recommended total knee replacement. (AR 240.) Plaintiff told Hassett that she was not ready for surgery but wanted to continue with an exercise program. (Id.) In September, 2002, Hassett reported that Plaintiff's knee intermittently became inflamed and was moderately inflamed during her visit. (AR 239.) In October, 2002, Plaintiff reported a pain level of four to six out of ten. (Id.) In November, 2002, Plaintiff reported feeling "very good" after her last physical therapy session and that her knee pain had diminished by approximately fifty percent. (AR 237.) In December, 2002, Hassett gave Plaintiff a neoprene knee brace and reported that she was vacillating between good days and bad days. (AR 236.)

In January, 2003, Hassett reported that Plaintiff was not improving from therapy in the long run but she "gets good relief in the short term." (AR 235.) In February, 2003, Plaintiff was fitted for an osteoarthritic brace. (AR 234.) In May, 2003, Plaintiff's knee was showing continuing signs of degeneration despite use of a variety of strengthening, stabilization and anti-inflammatory treatments. (AR 231.) Hassett stated that Plaintiff would potentially need a total knee replacement in the future and that he did not think that Plaintiff "will ever be able to return back to the work force because of the severe arthritic problems." (Id.)

On May 27, 2003, after Plaintiff's third arthroscopic surgery,

8

she was referred back to physical therapy. (AR 230.) Hassett reported that Plaintiff was not doing an exercise program at home but he would get her started on one. (Id.) Plaintiff stated at the ALJ hearing that the reason she was not doing home exercises at that time was because she considered going to physical therapy to be sufficient. (AR 315.)

In August, 2003, state agency medical consultant Dr. Sandra Clancey, M.D., completed a Physical Residual Capacity Assessment of Plaintiff based on review of her record and concluded that Plaintiff could lift and carry ten pounds frequently, stand or walk for two hours in an eight hour day and sit for six hours in an eight hour day. (AR 266.) Dr. Clancey indicated that Plaintiff was limited to occasional pushing and pulling with the left lower extremity, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling and should use a hand-held assistive device, as needed for prolonged ambulation. (AR 265-267.) Dr. Clancey reported that Plaintiff was not capable of climbing ropes and scaffolds, and could not walk on uneven surfaces. (AR 267, 269.) In September, 2003, state agency medical consultant Dr. Antoine Dipsia, M.D., also completed a Physical Residual Capacity Assessment of Plaintiff and reported that Plaintiff could lift and carry a maximum of ten pounds frequently and twenty pounds occasionally, stand and walk for four hours out of eight hours; sit for six hours in an eight hour day with normal breaks; and occasionally climb ramps and stairs, balance, stoop and crouch. (AR 279.) Dr. Dipsia indicated that Plaintiff could not operate lower extremity foot controls, climb ladders, ropes or

scaffolds, kneel or crawl.  (AR 279-280.)

C.   Lay Testimony

In a letter dated February 26, 2004, Marlene Thompsen, Plaintiff's supervisor immediately prior to her claimed disability onset date, wrote that Plaintiff had varying degrees of pain in her left knee and right hip area and had to take time off from work for doctors' appointments.  (AR 100.)  Thompsen also noted that Plaintiff avoided using the stairs at work, had trouble sitting for long periods at her desk, and had to sit on a stool when filing because she could not kneel or stoop.  (<u>Id.</u>)  Thompsen also observed Plaintiff taking pain medication regularly. (<u>Id.</u>)

In a February 24, 2004 letter, Plaintiff's neighbor Sally L. Johns stated that Plaintiff had three surgeries and would need total knee replacement surgery in the future. (AR 101.)  She also stated that Plaintiff is in a great deal of pain and takes pain medications.  (<u>Id.</u>)

D.   Plaintiff's Testimony

In June, 2004, Plaintiff testified at the hearing before the ALJ.  As of the June, 2004 hearing, Plaintiff was living with her seventeen year old grandson, whom she had raised since his infancy. Plaintiff has three adult children.  (AR 300; 307; 318.)

Plaintiff testified that her daily activities include dressing and grooming herself, preparing light meals and taking a nap for an hour to two hours in the afternoon.  (AR 314; 318.)  Plaintiff also testified that she goes grocery shopping once a week but does not carry the bags, does dishes on occasion, makes beds once a month, tries to go to church once a week and spends time with friends.

United States District Court
For the Northern District of California

(AR 318-321.)  Her grandson takes care of the laundry and she hires people to do her housecleaning and yard work.  (AR 324; 318-319.) Plaintiff watches television, pays bills, uses a laptop computer for internet and email for about one hour a day and reads for about one hour a day.  (AR 323-325.)  She also attends her grandson's school events, helps him with his homework and drives him places. (AR 324.)  Plaintiff used a treadmill and a stationary bike in 2003 but stopped because these activities were causing pain in her knee. (AR 260; 320.)  From 2001 to 2003, Plaintiff went downhill skiing on three occasions.  (AR 322.)  Plaintiff drove five hours in 2001 to take a church youth group skiing at Mount Shasta.  (AR 322.) Plaintiff also has been to Santa Rosa and attended a friend's wedding in Ukiah.  (AR 322-323.)

Plaintiff testified that she can lift ten pounds occasionally, can sit for thirty minutes at a time and can stand for thirty minutes at a time.  (AR 309.)  She also stated that she could sit for a total of four hours and stand for a total of six hours during an eight hour day.  (Id.)

Plaintiff testified that since 2001 the average pain level in her knee was eight and a half out of ten.  (AR 311.)

Plaintiff testified that she took Celebrex and Darvocet[9] to manage her pain.  (AR 311-312.)  She stated that she does not have side effects from these medications and that each medication reduces her pain level to five out of ten.  (AR 312.)  She received prescriptions for these medications from Dr. Schmidt but did not

---

[9]Darvocet is indicated for the "relief of mild or moderate pain."  Physicians' Desk Reference (PDR), 60th ed., 3497 (2006).

11

1   remember exactly when.  (AR 311.)

2       Plaintiff also testified that her symptoms were worse at the
3   June 3, 2004 hearing than they were in September, 2001, when she
4   retired.

5       E.   Vocational Expert Testimony and ALJ's Findings

6       The ALJ found Plaintiff's allegations regarding her
7   limitations only partly credible.  (AR 24; 25.)  The ALJ found
8   Plaintiff's testimony about her ability to function credible but,
9   after reviewing Plaintiff's activities and her medical records,
10  found that Plaintiff's testimony about the disabling nature of her
11  pain was not credible.  (AR 24.)

12      The ALJ determined Plaintiff's residual functional capacity
13  (RFC) by considering the May, 1994 Qualified Medical Evaluation of
14  Plaintiff by Dr. Damon (AR 125); the March, 2000 report by Humboldt
15  Orthopaedic Associates, Inc., stating that Plaintiff was "able to
16  do office working activities" (AR 164); the August, 2003 Physical
17  Residual Functional Capacity Assessment performed by medical
18  consultant Dr. Clancey (AR 265); reports that Plaintiff improved
19  after knee surgery in May, 2003 (AR 255; 287; 290; 292); and
20  Plaintiff's testimony about her own abilities.  (AR 308-311.)  The
21  ALJ stated that she gave less weight to the opinions of the state
22  agency's reviewing doctors and more weight to Plaintiff's testimony
23  and reports by doctors who actually examined Plaintiff.  (AR 24.)
24  The ALJ stated that where the RFC reported by the state agency
25  consultants differed from Plaintiff's testimony as to her own
26  abilities, the ALJ deferred to Plaintiff's testimony and that
27  Plaintiff's testimony about her on-the-job functioning was the

28                                  12

United States District Court
For the Northern District of California

basis for the hypothetical the ALJ gave to the vocational expert.

The ALJ determined that Plaintiff had the RFC to lift ten pounds occasionally, stand for a half hour at a time and about six out of eight hours, sit for a half hour at a time and about four out of eight hours, with no repetitive kneeling or squatting or prolonged standing or walking, and with an option to stand or sit while working.  The ALJ asked Vocational Expert (VE) Malcom Brodzinsky if a hypothetical person with Plaintiff's RFC could perform Plaintiff's last relevant work.  The VE testified that such a person could perform Plaintiff's past relevant work as an administrative assistant, as it is performed in the national economy.  (AR 333.)  He also testified that Plaintiff could work as a radio dispatcher, with 90,000 jobs across the United States and 1,200 in the region, noting that she had experience as a radio dispatcher while performing her past relevant work.  (AR 336-337.)

In her ruling, the ALJ found that Plaintiff met steps one and two of the five-step analysis to establish disability under 20 C.F.R. § 404.1520 (b)-(f).  (AR 25.)  At step one, the ALJ found that Plaintiff was not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b); (Id.).  At step two, the ALJ found Plaintiff's degenerative joint disease of the left knee and bursitis of the right hip to be "severe" based on the requirements in 20 C.F.R. § 404.1520(c).  (Id.)  At step three, the ALJ did not find these impairments met or equaled any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  20 C.F.R. § 404, Subpt. P, App. 1.  (Id.).  At step four, the ALJ determined that Plaintiff's RFC did not preclude her from performing her past

1   relevant work as an administrative assistant.  20 C.F.R.

2   § 404.1520(e).  (AR 26.)

3                          LEGAL STANDARD

4   I.   Overturning a Denial of Benefits

5        A court cannot set aside a denial of benefits unless the ALJ's

6   findings are based upon legal error or are not supported by

7   substantial evidence in the record as a whole.  42 U.S.C. § 405(g);

8   Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989); Martinez v.

9   Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Substantial evidence

10  is such relevant evidence as a reasonable mind might accept as

11  adequate to support a conclusion.  Richardson v. Perales, 402 U.S.

12  389, 401 (1971); Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir.

13  1995).  It is more than a scintilla but less than a preponderance.

14  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

15       To determine whether substantial evidence exists to support

16  the ALJ's decision, a court reviews the record as a whole, not just

17  the evidence supporting the decision of the ALJ.  Walker v.

18  Matthews, 546 F.2d 814, 818 (9th Cir. 1976).  A court may not

19  affirm the ALJ's decision simply by isolating a specific quantum of

20  supporting evidence.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir.

21  1989).  In short, a court must weigh the evidence that supports the

22  Commissioner's conclusions and that which does not.  Martinez, 807

23  F.2d at 772.

24       If there is substantial evidence to support the decision of

25  the ALJ, it is well-settled that the decision must be upheld even

26  when there is evidence on the other side, Hall v. Secretary, 602

27  F.2d 1372, 1374 (9th Cir. 1979), or when the evidence is

28                               14

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

susceptible to more than one rational interpretation, <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir. 1984).  If supported by substantial evidence, the findings of the ALJ as to any fact will be conclusive.  42 U.S.C. § 405(g); <u>Vidal v. Harris</u>, 637 F.2d 710, 712 (9th Cir. 1981).

II.  Establishing Disability Under the Social Security Act

Under the Social Security Act, "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  The impairment must be so severe that the claimant "is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work."  42 U.S.C. § 423(d)(2)(A).  In addition, the impairment must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory techniques."  42 U.S.C. § 423(d)(3).

To determine whether a claimant is disabled within the meaning of the Social Security Act, the Social Security Regulations set out a five-step sequential process.  20 C.F.R. § 404.1520 (b)-(f); <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991); <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998).  The burden of proof is on the claimant in steps one through four.  <u>Sanchez v. Secretary of Health and Human Servs.</u>, 812 F.2d 509, 511 (9th Cir. 1987).  In step one, the claimant must show that she or he is not currently

engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).
In step two, the claimant must show that he or she has a "medically
severe impairment or combination of impairments" that significantly
limits his or her ability to work.  20 C.F.R. § 404.1520(c)); Bowen
v. Yuckert, 482 U.S. 137, 140 (1987); Smolen v. Chater, 80 F.3d
1273, 1290 (9th Cir. 1996).  If the claimant does not, he or she is
not disabled.  Otherwise, the process continues to step three for a
determination of whether the impairment meets or equals a "listed"
impairment which the regulations acknowledge to be so severe as to
preclude substantial gainful activity.  Yuckert, 482 U.S. at 141;
20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If
this requirement is met, the claimant is conclusively presumed
disabled; if not, the evaluation proceeds to step four.  At step
four, it must be determined whether the claimant can still perform
"past relevant work."  Yuckert, 482 U.S. at 141; 20 C.F.R.
§ 404.1520(e).  If the claimant can perform such work, he or she is
not disabled.  If the claimant meets the burden of establishing an
inability to perform prior work, the burden of proof shifts to the
Commissioner for step five.  At step five, the Commissioner must
show that the claimant can perform other substantial gainful work
that exists in the national economy.  Yuckert, 482 U.S. at 141; 20
C.F.R. § 1520(f).

DISCUSSION

I.   Failure to Develop the Record

     Plaintiff argues that the decision of the ALJ is not supported
by substantial evidence because the ALJ failed to develop the
record in that she relied on a residual functional capacity

16

evaluation from 1994 and did not request a more contemporaneous evaluation.  Both parties agree that the Title II disability claim requires Plaintiff to prove that she was disabled prior to her date last insured (DLI), which is September 30, 2003.

Plaintiff bears the burden of proof and must prove that she was "either permanently disabled or subject to a condition which became so severe as to disable her prior to the date upon which her disability insured status expire[d]." Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  Plaintiff also must prove that she was disabled for twelve continuous months before her DLI.  See 42 U.S.C. § 423(c).  Although the claimant has the burden of proof, the ALJ has a duty to assist in developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The "ALJ has [a] basic duty to inform himself about facts relevant to his decision." (internal quotation marks omitted). DeLorme, 924 F.2d at 849.  The ALJ can fulfill his or her obligation by making a reasonable attempt to obtain medical evidence from the claimant's treating sources, or by ordering a consultative evaluation when the medical evidence is incomplete or unclear.  42 U.S.C. § 423(d)(5)(B); Harper v. Chater, 1996 WL 193860, at *3 (N.D. Cal. 1996).

However, the ALJ's duty to investigate does not extend to a duty to generate evidence of a disability that is not clearly indicated on the record.  Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977); Landshaw v. Secretary of Health and Human Servs., 803 F.2d 211, 214 (6th Cir. 1986).  The ALJ is not required to

order a consultative evaluation on the basis of a mere allegation of impairment.  42 U.S.C. § 423(d)(5)(A); Ladue v. Chater, 1996 WL 83880, at *4 (N.D. Cal. 1996).

The medical evidence reviewed by the ALJ regarding Plaintiff's disability claim includes records from Plaintiff's treating physician, orthopedists, physical therapist and State agency physicians' evaluations, from 1992 through 2003.  This detailed eleven-year medical history of Plaintiff's knee and hip problems provided a sufficient record to conclude that the ALJ fulfilled her duty to inform herself about the medical facts relevant to her determination of Plaintiff's RFC.  A consultative evaluation was not necessary because Plaintiff's medical records are complete and clear.

In determining Plaintiff's RFC, the ALJ not only considered the May, 1994 Qualified Medical Evaluation by Dr. Damon (AR 125), but also considered the March, 2000 report by Humboldt Orthopaedic Associates, Inc., stating that Plaintiff was "able to do office working activities" (AR 164), the August, 2003 Physical Residual Functional Capacity Assessment performed by consultant Dr. Clancey, a state agency medical consultant (AR 265), reports that Plaintiff improved after knee surgery in May, 2003 (AR 255; 287; 290; 292), and Plaintiff's testimony about her own abilities.  (AR 308-311.) In addition, the ALJ gave less weight to the opinions of the state agency's reviewing doctors and more weight to Plaintiff's

18

United States District Court

For the Northern District of California

testimony.  (AR 24.)  Where state agency doctors' RFC differed from Plaintiff's testimony as to her abilities, the ALJ deferred to Plaintiff's testimony.  For example, Dr. Clancey concluded that Plaintiff could sit for six hours in an eight hour day, but the ALJ deferred to Plaintiff's testimony that she could only sit for four out of eight hours.  Plaintiff also testified that she asked either Dr. Schmidt or Dr. Alavezos about whether she should return to work and was told that it was her decision.  (AR 326.)  In addition, in May, 2003, Plaintiff's physical therapist reported that, after left knee surgery, Plaintiff was ambulating without a cane and had full range of motion.  (AR 292.)

Furthermore, Plaintiff testified that she had the RFC used by the ALJ, that her medications reduced her pain level to a five out of ten without side effects and that she could perform activities such as reading, using the internet, emailing, socializing, grocery shopping and driving.  Given Plaintiff's testimony, the ALJ could conclude that further development of the record was not necessary and that Plaintiff's pain was not disabling.

Citing Armstrong v. Commissioner, 160 F.3d 587, 589 (9th Cir. 1998), Plaintiff also argues that the ALJ erred in failing to seek the help of a medical advisor to determine Plaintiff's disability onset date.

Social Security Ruling 83-20 sets out guidelines for the determination of the onset of disability.  It provides, in relevant

part:

> The onset date of disability is the first day an
> individual is disabled as defined in the Act and the
> regulations.  Factors relevant to the determination of
> disability onset include the individual's allegation, the
> work history and the medical evidence.  These factors are
> often evaluated together to arrive at the onset date.
> However, the individual's allegation or the date of work
> stoppage is significant in determining onset only if it is
> consistent with the severity of the condition(s) shown by
> the medical evidence.  A title II worker cannot be found
> disabled under the Act unless insured status is also met
> at a time when the evidence establishes the presence of a
> disabling condition(s).

SSR 83-20.

In <u>Armstrong</u>, 160 F.3d at 590, the Ninth Circuit concluded

that when evidence regarding the onset date is ambiguous and a

medical inference must be made, SSR 83-20 requires the ALJ to "call

upon the services of a medical advisor and obtain all evidence

which is available to make the determination."  In <u>Armstrong</u>, the

ALJ found that the plaintiff was disabled from the date he had

filed his application for benefits.  <u>Id.</u>  Because the plaintiff

suffered from physical and mental impairments prior to the date he

filed his application, and because the record was not clear as to

when those impairments became disabling, the court concluded that

the ALJ erred because he failed to call a medical advisor to aid in

determining the date of onset.  <u>Id.</u>

Unlike in <u>Armstrong</u>, the ALJ here did not find that Plaintiff

was disabled.  Under these circumstances, where there is no

disability, there is no date of onset to be determined.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

For the above-mentioned reasons, the Court finds that the record was sufficiently developed and there was no reason for the ALJ to have sought the advice of a medical advisor.

II.   Credibility Analysis

Plaintiff argues that the ALJ's conclusion that Plaintiff was not credible was based on her mischaracterization of Plaintiff's testimony regarding her activities of daily living because it was not every day that she went skiing, drove to Mount Shasta, attended church, went to Santa Rosa and Ukiah, used a treadmill or used a stationary bicycle.

In Cotton v. Bowen, 799 F.2d 1402 (9th Cir. 1986), the Ninth Circuit developed a threshold test to determine the credibility of a claimant's subjective symptom testimony.  Under Cotton, a claimant "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (quoting Cotton, 799 F.2d at 1407-08); see also Smolen, 80 F.3d at 1282.  Cotton requires "only that the causal relationship be a reasonable inference, not a medically proven phenomenon."  Smolen, 80 F.3d at 1282.  Therefore, a claimant is not required to produce objective medical evidence of the pain itself or its severity.  Id. (citing Bunnell, 947 F.2d at 347-48).  "It is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not

21

United States District Court
For the Northern District of California

fully corroborated by objective medical findings." Cotton, 799

F.2d at 1407; Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).

Once a claimant meets the Cotton test, "the Commissioner may

not discredit the claimant's testimony as to subjective symptoms

merely because they are unsupportable by objective evidence.

Unless there is affirmative evidence showing that the claimant is

malingering, the Commissioner's reason for rejecting the claimant's

testimony must be 'clear and convincing.'" Lester, 81 F.3d at 834

(quoting Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989));

Smolen, 80 F.3d at 1281.  When outlining the findings supporting a

conclusion that a plaintiff's testimony is incredible, the ALJ must

consider "all of the available evidence" in analyzing the severity

of the claimed pain.  SSR 88-13.  Factors to be analyzed include:

(1) the nature, location, onset, duration, frequency, radiation,

and intensity of any pain; (2) precipitating and aggravating

factors; (3) type, dosage, effectiveness and adverse side effects

of any pain medications; (4) treatment, other than medication, for

relief of pain; (5) functional restrictions; and (6) the

plaintiff's daily activities.  Id.; see Fair, 885 F.2d at 603

(types of activities ALJ may rely on to find pain allegations

credible include the type of daily activities performed by

plaintiff and whether plaintiff sought or followed treatment);

Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001) (finding

rejection of plaintiff's alleged pain justified where plaintiff had

little evidence of spinal abnormalities, had not used strong pain medication, had not participated in pain management or physical therapy, and limited daily activities by choice not necessity). However, medical evidence is still relevant in determining the severity of a plaintiff's alleged pain and its disabling effects. 20 C.F.R. § 404.1529(c)(2); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In support of Plaintiff's subjective symptom testimony, including lower back pain and abdominal pain, she presented objective medical evidence of her physical impairments as required by the Cotton test. Because the ALJ cites no affirmative evidence that Plaintiff is malingering, she must present clear and convincing reasons for rejecting Plaintiff's testimony.

In support of her determination that Plaintiff was not credible, the ALJ cited Plaintiff's testimony that she went downhill skiing once a year during 2001, 2002 and 2003, a time when she claims to have been disabled; drove a church youth group on a five-hour trip to Mount Shasta in 2001; looked for work in 2003; and was raising her grandson, who was seventeen years old at the time of the hearing. (AR 24.) The ALJ stated that Plaintiff was not credible regarding the extent of her pain because she "attends church, uses a treadmill and stationary bicycle, goes to her grandson's school events, travels to Santa Rosa and north of Ukiah, uses a computer and drives." (Id.) The ALJ included these

activities in a paragraph discussing Plaintiff's activities of daily living. Although it is obvious that Plaintiff was not involved in all of these activities every day, they are relevant to whether or not Plaintiff's testimony is credible because the activities she performed during the time when she claimed to be disabled are not consistent with the activities of a person who is disabled from knee and hip pain. Therefore, the ALJ properly considered them in her analysis that Plaintiff's claim of disability is not entirely credible.

Citing <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998), Plaintiff argues that the ALJ did not accurately characterize Plaintiff's testimony and thus the decision is not supported by substantial evidence. Plaintiff points out that the ALJ stated that Plaintiff "attends church," but Plaintiff testified that she tries to "go to church every week" (AR 24, 307); the ALJ stated that Plaintiff "cooks," but Plaintiff testified that she cooks "light meals" (AR 24, 318); the ALJ stated that Plaintiff uses a treadmill and a stationary bike, but Plaintiff reported that she is no longer doing so because using them made her pain worse (AR 24, 320); the ALJ stated that Plaintiff "goes to Santa Rosa," but Plaintiff testified that she's "been to Santa Rosa" (AR 24, 322); and the ALJ stated that Plaintiff "travels north of Ukiah," but Plaintiff testified that she went to Ukiah once for a wedding and her grandson helped her drive (AR 24, 323).

United States District Court
For the Northern District of California

In <u>Reddick</u>, the plaintiff attested that her activities were sporadic and punctuated with rest due to chronic fatigue syndrome (CFS). <u>Id.</u> The court found that the evidentiary basis for the ALJ's decision did not properly characterize the plaintiff's testimony, including the content or tone of the record, and held that there was considerable evidence in the record to belie the ALJ's conclusions. <u>Id.</u> at 723-724.

This case is distinguishable from <u>Reddick</u> because here the ALJ did not misunderstand or mischaracterize Plaintiff's testimony in any substantial way.

Furthermore, the ALJ found that Plaintiff did not fully comply with medical advice because she rejected cortisone shots, failed to undertake the home physical therapy program prescribed by physical therapist Bob Hassett and refused to have total knee replacement surgery. (<u>Id.</u>) The ALJ also noted the fact that Plaintiff's testimony that her pain had averaged eight and a half out of ten since 2001 was not consistent with medical records that report that she had a pain level of three out of ten in July, 2002 and a level of four to six out of ten in October, 2002. (<u>Id.</u>)

Based on the above, the Court finds that the ALJ supported her credibility determination with clear and convincing reasons.

III. Failure to Address Lay Testimony

Plaintiff argues that the ALJ erred because she failed to

United States District Court
For the Northern District of California

address the lay testimony from Plaintiff's neighbor and from her former supervisor.

In a claim for disability benefits, the ALJ will consider "observations by non-medical sources" as evidence of the claimant's impairment. 20 C.F.R. § 404.1513(e)(2). Lay witness testimony by friends, neighbors, and family members in a position to observe the claimant's symptoms is competent evidence and, therefore, cannot be disregarded without comment. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987); Stout v. Comm'r, 454 F.3d 2050, 2053. Therefore, if the ALJ wishes to discount the testimony of lay witnesses, he must give reasons pertinent to each witness. Id. If the ALJ fails to address competent lay testimony favorable to the claimant, the error cannot be considered harmless unless a reviewing court "can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056.

In her decision, the ALJ did not address the letters from Plaintiff's neighbor and her former supervisor. However, the witnesses' statements about Plaintiff's pain and the reasons she retired are necessarily based on Plaintiff's statements to them. The remaining information offered by these witnesses merely repeats information in Plaintiff's medical records which the ALJ considered in her analysis: doctors' appointments, pain medication, surgery and possible knee replacement surgery. Therefore, no reasonable

ALJ could have reached a different disability determination based on the letters.  Accordingly, this claim does not support Plaintiff's motion for summary judgment or remand.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment or for remand is denied and Defendant's cross-motion for summary judgment is granted.  Judgment shall enter accordingly. Each party shall bear her own costs.


IT IS SO ORDERED.

Dated: 3/2/07

_____
CLAUDIA WILKEN
United States District Judge